**The below described is SIGNED.**

**Dated: January 31, 2011**  _____
                              **R. KIMBALL MOSIER**
                              **U.S. Bankruptcy Judge**



_____

*Prepared and Submitted By:*

Peggy Hunt (Utah State Bar No. 6060)
Cameron Hancock (Utah State Bar No. 05389)
Nathan S. Seim (Utah State Bar No. 12654)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  hunt.peggy@dorsey.com
        hancock.cameron@dorsey.com
        seim.nathan@dorsey.com

*Attorneys for Gil A. Miller, Chapter 11 Trustee*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br>WATERFORD FUNDING, LLC,<br>WATERFORD LOAN FUND, LLC,<br>INVESTMENT RECOVERY, LLC,<br>WATERFORD SERVICES, LLC,<br>WATERFORD CANDWICH, LLC, *and*<br>WATERFORD PERDIDO, LLC,<br><br><br>Debtors. | **Bankr. Case No. 09-22584**<br>(Substantively Consolidated)<br><br>Chapter 11<br><br>The Honorable R. Kimball Mosier<br><br>**[FILED ELECTRONICALLY]** |

**SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING
TRUSTEE'S MOTION TO SUBSTANTIVELY CONSOLIDATE SUBSIDIARIES AND
INVESTMENT RECOVERY, LLC AS OF THE PETITION DATE**

An evidentiary hearing was held by this Court on December 22, 2010 on the "Motion to Substantively Consolidate Subsidiaries and Investment Recovery, LLC as of the Petition Date" [Docket No. 805] (the "Consolidation Motion") filed by Gil A. Miller, Chapter 11 Trustee for Waterford Funding, LLC and Waterford Loan Fund, LLC (the "Trustee").[1] The Trustee was represented by Peggy Hunt and Cameron M. Hancock of Dorsey & Whitney LLP. Appearances also were entered by Elaine A. Monson of Ray Quinney and Nebeker PC for Westmark Health Care Distributors, Inc. ("Westmark"), and Laurie Cayton for the United States Trustee ("UST").

One Objection to the Consolidation Motion was filed by Westmark [Docket No. 842] and the Trustee filed a Reply [Docket No. 927] thereto. Prior to the scheduled hearing, Westmark withdrew its Objection to the Consolidation Motion, and the Consolidation Motion is unopposed. The UST stated on the record that given the evidence and the applicable law, as well as the circumstances of this case, it supported the Consolidation Motion.

Based on the Court's review of the Consolidation Motion, the Memorandum of Law in Support of the Consolidation Motion [Docket No. 806], other pleadings filed in relation to the Consolidation Motion referenced above, the Notices of Hearing [Docket Nos. 807 & 859], the Certificates of Service [Docket Nos. 808 & 859], the evidence presented and received at the hearing, including the uncontested proffer of testimony of Scott Christensen ("Christensen") and the Trustee, the arguments of counsel, the applicable law and for good cause appearing, the Court ordered on the record at the conclusion of the hearing that the Consolidation Motion was granted, that Waterford Services, LLC ("Services"), Waterford Perdido, LLC ("Perdido"), Waterford Candwich, LLC ("Candwich") and Investment Recovery, LLC ("Investment

---

[1] The hearing commenced on December 16, 2010, but was continued on the record at that time until December 22, 2010.

-2-

Recovery") (collectively, the "Entities") are substantively consolidated in the above-captioned case as of March 20, 2009, and requested that counsel prepare proposed findings of fact and conclusions of law. The Court has entered its "Order Granting Trustee's Motion to Substantively Consolidate Subsidiaries and Investment Recovery, LLC as of the Petition Date" [Docket No. 1077], and pursuant to Federal Rule of Bankruptcy Procedure 7052 and this Court's Local Rules, the Court now enters the following Findings of Fact and Conclusions of Law.[2]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Jurisdiction

1.   On March 20, 2009 (the "Petition Date"), Investment Recovery, acting through Daniel A. Scarlet ("Scarlet"), caused Waterford Funding, LLC ("Funding") and Waterford Loan Fund, LLC ("Loan Fund") (together, the "Debtors") to file voluntary petitions in this Court seeking relief under Chapter 11 of the Bankruptcy Code. The Debtors' respective estates have been substantively consolidated by prior order of this Court. *See* Order Granting Motion for Substantive Consolidation of the Debtors' Affiliated Chapter 11 Cases [Docket No. 173].

2.   This Court has subject matter jurisdiction over the Consolidation Motion pursuant to 11 U.S.C. § 105 and 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

3.   This Court has personal jurisdiction over the Debtors, as well as over the non-debtor Entities to be consolidated. The Trustee is the person in control of these Entities, and the Entities, through the Trustee, have consented to the jurisdiction of this Court.

---

[2]   To the extent that any Findings of Fact are Conclusions of Law, they are adopted as such, and to the extent that any Conclusions of Law are Findings of Fact, they are adopted as such.

### Notice

4. Based on the evidence presented, the mailing matrix attached to the Certificate of Service [Docket No. 808], which Certificate of Service is relevant to the Consolidation Motion and the Notice of Hearing, is a true and correct listing of all known creditors.

5. All creditors known to the Trustee and interested parties were served with notice of the Consolidation Motion and were provided an opportunity to be heard.

6. Other than Westmark's Objection, no parties in interest have objected to the Consolidation Motion, and the Westmark Objection now has been withdrawn. Thus, there are no objections to the Consolidation Motion.

### Qualification of the Trustee as an Expert

7. As set forth in the resume admitted into evidence as Exhibit 2, the Trustee: (a) is the Senior Managing Member of Rocky Mountain Advisory, LLC; (b) has 25 years of experience in public accounting, focusing primarily in work involving investigative accounting, bankruptcy, and fraud examination; (c) is a licensed CPA, Certified Fraud Examiner, and Certified Insolvency and Restructuring Advisor; (d) has numerous professional memberships and other credentials, all of which are set forth in the resume; and (e) has served as an expert witness in numerous types of matters including on issues involving forensic accounting and Ponzi schemes.

8. Based upon his knowledge, skill, experience, training and education, as well as his application of theory and techniques related to forensic accounting, including his use of techniques generally accepted in the relevant technical community, the Trustee is qualified to testify as a forensic accounting expert witness in accordance with the requirements and principles set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).

**Post-Petition Management of the Debtors**

9. As of the Petition Date through January 5, 2010, the Debtors managed their property as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 through Scarlet and Investment Recovery.

10. On January 5, 2010, the Court entered an "Order Granting Debtors' Motion to Approve Resignation of Daniel A. Scarlet as Chief Restructuring Officer, and for Appointment of Chapter 11 Trustee" [Docket No. 237].

11. The Trustee was appointed by Order entered on January 6, 2010 [Docket No. 238].

12. On July 14, 2010, the Trustee filed the "First Report of Gil A. Miller, Chapter 11 Trustee, Pursuant to 11 U.S.C. § 1106(a)(3) and (a)(4)(A)" [Docket No. 200] (the "First Report"), a true and accurate copy of which was admitted into evidence as Exhibit 3, setting forth the scope and the findings of his investigation of the "Waterford Enterprise" (defined below) during the periods prior to and after the Petition Date. As part of his investigation, the Trustee relied on statements made to him informally and under oath by Christensen and Tiffany Wolf, former employees of the Debtors, which statements are included in the examination transcripts admitted as Exhibit 4 and Exhibit 5, respectively.

13. Since July 14, 2010 and the filing of his First Report, the Trustee has continued to administer the Debtors' estate, including by examining Travis L. Wright ("Wright"), the person who was in control of the Waterford Enterprise prior to the Petition Date. A true and correct copy of a transcript of this examination has been admitted into evidence as Exhibit 6. Wright has made certain admissions to the Trustee, including those admissions set forth in sworn statements attached to Exhibit 3. *See* Exhibit 3 (First Report, Report Exhibits 1 and 2).

**The Subsidiaries and Management Thereof**

14. In September 1999, Wright organized a Utah limited liability company under the laws of the State of Utah called "Wrightway Investments, LLC," and on or about September 6, 2001, Wright caused Wrightway Investments, LLC to change its name to "Waterford Funding, LLC" (Wrightway Investments, LLC and Funding are hereinafter collectively referred to as "Funding").

15. Wright was the sole manager and member of Funding, and at all times relevant hereto, Wright exclusively controlled Funding.

16. As of or after September 2001, when he changed the name of Wrightway Investments, LLC to Waterford Funding, LLC, Wright caused numerous subsidiaries and affiliates of Funding to be formed, which are collectively referred to with Funding as the "Waterford Enterprise."

17. Prior to the Petition Date, the Waterford Enterprise was organized substantially in the form set forth on the Organizational Chart attached as Report Exhibit 3 to the First Report admitted herein as Exhibit 3, and the Waterford Enterprise includes the Debtors as well as, in relevant part, Services, Candwich and Perdido (collectively, the "Subsidiaries").

18. Funding is the sole member of each of the Subsidiaries.

19. Each of the Subsidiaries, like Funding, was managed and controlled exclusively by Wright.

20. From 1999 through approximately March 12, 2009, Wright had exclusive control of the management and all monies, properties, bank accounts, funds and activities of the Waterford Enterprise, including the Subsidiaries.

21. Since his appointment as Trustee to present, the Trustee has been in control of the Subsidiaries.

22. The Trustee, through counsel, has caused the corporate records filed with the State of Utah to be amended to reflect that he is the registered agent and the person in control of the Subsidiaries. *See* Exhibit 9 through Exhibit 11.

### Investment Recovery and Management Thereof

23. Investment Recovery was formed prior to the Petition Date for the sole purpose of holding Funding's membership interests and assets.

24. At the time of the Trustee's appointment, membership in Investment Recovery was owned by DAS Financial, LC ("DAS"), an entity controlled by Scarlet.

25. Prior to January 5, 2010, when the Court appointed a Chapter 11 trustee in the Debtors' case, the Debtors and Investment Recovery were managed by Scarlet.

26. Since the Trustee's appointment on January 6, 2010, Scarlet and/or DAS assigned all interests in Investment Recovery to the Trustee for the benefit of the Debtors' consolidated estate.

27. At all times relevant hereto, the Trustee has been in control of Investment Recovery, and is presently in control of Investment Recovery.

28. The Trustee has caused the corporate records filed with the State of Utah to be amended to reflect that he is the registered agent and the person in control of Investment Recovery. *See* Exhibit 12.

### The Waterford Enterprise's Pre-Petition Accounts, Accounting, and Lack of Operations/Capitalization

#### Bank Accounts

29.     At all times after the formation of the Subsidiaries and through the Petition Date, Funding and all of the Subsidiaries operated at any one time through the use of two bank accounts: one account in the name of Funding; and one account in the name of Services (together, the "Accounts").

30.     The Account in the name of Funding was viewed by employees as an account to handle operations, and the Account in Services' name was viewed as an account to handle investor funds and loans to third parties.   In reality, however, funds were deposited into the Accounts, commingled, and paid out of the Accounts at Wright's sole direction.  *See* Exhibit 4 (Christensen Transcript at p.12 (We had two checking accounts . . . but  . . . Travis would say, 'let's cut a check.'  He would tell me Funding or Services. . . .")). Exhibit 3 (First Report, Report Exhibit 1 at ¶ 11); *see id.* at ¶ 14 (monies in the Accounts were treated as one  pool of cash that was used by Wright at his direction).

31.     Funds in the Accounts were transferred at Wright's direction to entities within the Waterford Enterprise in need of cash, or to Wright for the personal use and benefit of himself and his family.

32.     The majority of funds raised from Waterford investors were deposited into the Accounts, and all monies deposited into the Accounts were commingled.   The limited loans made by Waterford to third parties were made from the commingled funds in the Accounts, and payments made on loans were deposited in the Accounts and commingled with investor funds.

33.     Perdido and Candwich did not have bank accounts.

34. Wright used all of the funds in the Accounts after the Petition Date while the Debtors were Debtors in possession, and the Accounts were closed by the financial institution in approximately April 2009. Exhibit 3 (First Report). When the Trustee was appointed, none of the Subsidiaries had bank accounts.

35. On or about the Petition Date, Scarlet opened a bank account for Investment Recovery, but more than one-half of the funds deposited into this account originated from the accounts held by the Debtors in possession. When the Trustee was appointed, he took possession and control of this account, which had an $8.00 balance. Exhibit 3 (First Report at Report Exhibit 4-2).

## Accounting

36. Funding employed Christensen, an accountant, in June 2006 to assist Wright in preparing accounting records for the Waterford Enterprise. Prior to Christensen being hired, neither Funding nor its Subsidiaries employed an accountant or kept formal accounting records. Rather, Wright maintained financial records in a single "Microsoft Money" program on his personal computer. After the Subsidiaries were formed, and until approximately June 2006 when Christensen was hired, Wright continued to prepare and maintain the financial records of the various entities in that single Microsoft Money program. Upon employment, Wright directed and instructed Christensen to go back and get the bank account statements for the Accounts and to prepare QuickBooks files for Funding and Services.

37. Given the separate bank Accounts, Christensen prepared QuickBooks records for Funding and Services, and each entity initially had its own QuickBooks file.

38. Christensen created QuickBooks records for Funding dated back to September, 2000, which was the earliest date for which bank records could be obtained. He did the same for

Services dated back to September 2001, which was the earliest date for which bank records could be obtained.

39.     Although he began preparing QuickBooks files for Funding and Services as holders of the Accounts, Christensen quickly determined that due to the significant inter-company transactions, Funding and Services were "really only one company." Exhibit 4 (Christensen Transcript at pp. 7 & 99; *accord id.* at pp. 12 & 116-117).

40.     As a result, in approximately March 2007, Christensen combined the two entities into a single QuickBooks file, with all of the accounting data for Services being included in Funding's QuickBooks file. Any financial statements that were created for these entities combined the assets and liabilities of Funding and, among others, the Subsidiaries and other entities in the Waterford Enterprise. Thus, the creditors of Services became the creditors of Funding. *See* Exhibit 4 (Christensen Transcript at pp.6-13 ("If you're concerned about whether it's a Waterford Funding balance sheet and Services balance sheet, it really doesn't exist.")).

41.     The Trustee took possession and control of the accounting records of the Waterford Enterprise upon his appointment, and at that time, the accounting records of Funding and Services were combined.

42.     Candwich never had separate accounting records.

43.     Perdido had a separate QuickBooks file, but because it had no bank accounts, this file consisted primarily of inter-company transactions with Funding and Services.

44.     Investment Recovery has no formal financial papers. Other than organizational papers, it has bank account statements and records of some deposits and disbursements out of the bank account that was opened in its name by Scarlet.

-10-

### Operations

45. The Subsidiaries had substantially no business except through the combined Waterford Enterprise, and no assets except funds conveyed to them from the commingled Accounts and property acquired from the funds received through the commingled Accounts.

46. Investment Recovery had no corporate purpose or business other than to hold Waterford property and to file Chapter 11 petitions for the Debtors. It had no means to preserve and protect those assets.

47. Creditors viewed the Debtors and the Entities as a collective enterprise, and the financial records of the Waterford Enterprise showed that it operated at a loss since at least 1999.

48. Prior to the Petition Date, all of the entities in the Waterford Enterprise were housed at a single location, which was an office building located at 1774 East 4500 South, Holladay, Utah 84117 through approximately March 2006, and located at 4543 South Holladay Boulevard, Salt Lake City, Utah 84117 through the Petition Date. After the Petition Date, Investment Recovery and the Debtors were operated by Scarlet from a single office located in Holladay.

49. There were never more than two employees of Funding at any one time, and these employees performed services for the entire Waterford Enterprise. Only Wright had management authority, and he alone controlled the day-to-day business operations of the Waterford Enterprise.

50. Tax returns were not filed for the Debtors or Services. <u>Exhibit 3</u> (First Report, Report Exhibit 1 at ¶ 13). The rationale for not filing tax returns was that the Waterford Enterprise never had any profits.

51. Waterford used a database referred to by Wright and Waterford employees as the "Waterford Investor Program" ("<u>WIP</u>"). WIP is a Microsoft Access program that was modified for Waterford's use containing Waterford investor data. While WIP was used by Waterford to track funds invested and payments made to investors, it did not track which entity took funds from or made payments to investors.

52. Promissory notes issued to Waterford investors referred to Debtor Loan Fund, but Loan Fund did not have a bank account in which to deposit investor funds or to make payments under the notes. Rather, investor funds were deposited into the Accounts, and payments made to investors were made from the Accounts. Typically, these payments were made out of the Account in Services' name.

<u>Lack of Capitalization and Recognition of Separateness</u>

53. The Subsidiaries did not have any independent form of capitalization. They had no capital when they were formed and they obtained any and all capital, if any, through inter-company transfers of investor funds that were in the commingled Accounts.

54. The Subsidiaries were controlled exclusively by Wright, and Wright did not act independently and in the separate interests of the various entities.

55. Investment Recovery never had a life outside of assets that were transferred to it by Waterford and/or Wright, and had no means for preserving, protecting or maximizing the value of those assets.

56. Formal legal requirements recognizing the Debtors and the Entities as separate and independent entities were not observed. The Debtors and the Entities were operated by Wright or Scarlet as a common enterprise.

**The Entities' Creditors and Lack of Assets**

57. To the extent that creditors of the Entities to be consolidated exist, the Debtors' known creditors as of the Petition Date are identical to and/or overlap with those of the Entities. This finding is based on the following:

Services

58. Waterford Services had no business independent of the Debtors. In fact, Services did not engage in any business, but rather held one of the Accounts in its name, through which it received funds from and paid funds out to investors. A limited number of real estate loans were made by Waterford to third parties in the name of Services, but the funds from those loans were made from the Accounts in the name of Funding or Services, which included commingled investor funds. Services had no capitalization independent of the Accounts from which to make loans.

59. As of the Petition Date, Services had no known creditors, and to the extent that any exist, they are identical to the Debtors' creditors. Generally, debt was incurred by the Debtors—promissory notes issued to investors were in the name of Debtor Loan Fund (which did not have a bank account) and the Waterford Enterprise's operating expenses were incurred by Debtor Funding.

60. On the date of the Trustee's appointment, the Account in Services' name had been closed.

61. By granting the Consolidation Motion as to Services, the estate does not gain creditors, but does gain assets in the form of avoidance actions and potential loan receivables.

62. In addition, granting the Consolidation Motion as to Services will in no way affect the collateral position of any secured creditor (to the extent any exist).

63. The Trustee knows of no guarantees of corporate debt by Services.

### Perdido

64. Perdido was formed for the purpose of holding a loan that was made by Funding and/or Services to Perdido Village.

65. Perdido had no business at all, it had no bank accounts, it has no known creditors other than Funding and/or Services, and it has no assets.

66. Granting the Consolidation Motion as to Perdido will in no way affect the collateral position of any secured creditor (to the extent any exist).

67. The Trustee knows of no guarantees of corporate debt by Perdido.

### Candwich

68. Candwich was formed for the purpose of holding a loan that was made by Funding and/or Services to Candwich Food Corporation.

69. Candwich had no business at all, it had no bank accounts, and it has no known creditors.

70. This entity's only asset is what is referred to as the "Candwich loan." The loan obligation is now payable to the estate under a Settlement Agreement entered into by the Trustee, both as the Trustee of the Debtors and as the person in control of Candwich, on the one hand, and the Candwich-affiliated parties, on the other hand. The Settlement Agreement has been approved by the Court [Docket Nos. 734 & 897].

71. Granting the Consolidation Motion as to Candwich will in no way affect the collateral position of any secured creditor (to the extent any exist).

72. The Trustee knows of no guarantees of corporate debt by Candwich.

Investment Recovery

73. No creditors of Investment Recovery are believed to exist, but to the extent that they might exist, they are on the mailing matrix and have been served with the Notices Hearing related to the Consolidation Motion. If creditors of Investment Recovery do exist, the debt owed is not more than $6,000.00.

74. Investment Recovery does not have any assets other than its ownership of the Debtors' membership interests and Waterford property through assignment—which interests have all been transferred to the Trustee since his appointment.

75. Granting the Consolidation Motion as to Investment Recovery will in no way affect the collateral position of any secured creditor (to the extent any exist).

76. The Trustee knows of no guarantees of corporate debt by Investment Recovery.

**Inability to Separate the Debtors and the Entities and
the Futility of Filing Petitions for the Entities**

77. Treating the Debtors and the Entities as separate entities would be a fiction because although the Debtors and the Entities were organized as separate entities under Utah law, the Entities had no life or capitalization independent of the Debtors.

78. Because there was no separation of the business or identities of the Entities, any attempt to assign assets and liabilities of the pre-petition enterprise would be a fiction. Even if it were possible to separate the assets and liabilities of the pre-petition common enterprise, the Trustee has determined in a proper exercise of his business judgment that it would be prohibitively expensive to do so and would serve no purpose.

79. The Court finds that the Trustee has determined in a proper exercise of this business judgment that it would not be appropriate to file separate bankruptcy petitions for the

Entities inasmuch as: (a) the Entities have no financial resources to do so; (b) attempting to create Statements and Schedules for Services would be a futile exercise because the Trustee cannot separate the respective assets and liabilities of the Debtors and Services; (c) any Statements and Schedules he would file for Services would be identical to those of the Debtors, and any Statements and Schedules that would be prepared for Perdido, Candwich and Investment Recovery would contain minimal information (and there are no creditors in which to make disclosures in any event other than the Debtors' estate); and (d) in his capacity as Trustee for the Debtors, he is the person who controls the Entities, and on behalf of the Entities he consents to the jurisdiction of this Court over the Entities.

### Lack of Prejudice and Equitable Reasons for Consolidation

80.     Recognizing the separateness of the Debtors and the Entities would be inequitable to all creditors of the estate and would sanction Wright's fraud and promote injustice.

81.     To the extent that creditors of any of the Entities to be consolidated exist, they are not prejudiced by substantive consolidation.

82.     The Debtors' creditors will not be prejudiced by granting the Consolidation Motion because (a) consolidation of Investment Recovery, Perdido and Candwich is administrative in nature and does not add creditors to the estate; and (b) to the extent that Services has any creditors, they are the same creditors as the Debtors, holding the same claims that they would hold against the Debtors.

83.     Substantive consolidation of the Debtors and the Entities will promote equity among creditors, and will aid in the Trustee's efficient administration of the estate.

84.     The factors relevant to substantive consolidation articulated in *Fish v. East*, 114 F.2d 177, 191 (10th Cir. 1940) and *Federal Deposit Ins. Corp. v. Hogan (In re Gulfco Invest.*

*Corp.),* 593 F.2d 921, 928-29 (10th Cir. 1979) are non-exclusive; but, all of those factors which are relevant to the facts in this case have been met.

### *Nunc Pro Tunc* **Substantive Consolidation**

85. Substantive consolidation of the Debtors and the Entities as of March 20, 2009 is appropriate.

86. The Court has considered the test for *nunc pro tunc* consolidation set forth in *In re Auto-Train Corp.*, 810 F.2d 270 (D.C. Cir. 1987) and concludes that the Trustee has shown that *nunc pro tunc* consolidation achieves benefit and avoids harm. Furthermore, in accordance with the test for *nunc pro tunc* consolidation in *In re Baker & Getty Fin. Services, Inc.*, 974 F.2d 712 (6th Cir. 1992), such consolidation is appropriate because creditors and parties in interest have dealt with the Entities and the Debtors as if they were the same, and the affairs of the entities are so entangled that it is not feasible to identify and allocate assets and liabilities.

87. In making this conclusion, the Court believes that it is particularly important that none of the Entities conducted business after the Debtors' Petition Date and, therefore, there has been no change in the Entities' debtor-creditor relationships.

---

End of Document